UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**THUNDER MARINE, INC.,**

    **Plaintiff,**

v.                                              CASE NO. 8:06-CV-384-T-EAJ

**BRUNSWICK CORPORATION,**
**a Delaware corporation,**

    **Defendant.**
_____/

## ORDER

Before the court are **Defendant's Motion for Summary Judgment** (Dkt. 32), and Plaintiff's **Response in Opposition** (Dkt. 51).[1] This court held oral argument on July 19, 2007. Upon consideration, and after reviewing the depositions, affidavits, and pleadings filed by the parties, Defendant's motion for summary judgment is granted.

**I.    Background Facts**

Plaintiff, a Florida corporation, sues Defendant, a Delaware corporation with its principal place of business in Illinois, for breach of fiduciary duty and violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Section 501.201, et. seq. (2006).[2] Plaintiff filed its complaint in Pinellas County Circuit Court on March 1, 2006 (Dkt. 2). Defendant removed the action on March 8, 2006 (Dkt. 1).

Plaintiff Thunder Marine, owned by Mark LaPrade ("LaPrade"), is a boat dealer located in

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge on May 17, 2007 (Dkt. 58).

[2] The parties agreed to voluntarily dismiss Count II of the complaint, Common Law Unfair Competition, on April 20, 2007 (Dkt. 53).

Pinellas County, Florida. Defendant Brunswick Corporation is one of the world's largest manufacturer of marine products. During the time period relevant to this lawsuit, Plaintiff contracted with four of Defendant's subsidiary companies for the sale, display, and service of Brunswick products, which included Maxum, Bayliner, Trophy, and Baja boats. Brunswick's U.S. Marine division has previously recognized Thunder Marine with several national awards for outstanding dealer performance.

Plaintiff's business model includes the service and maintenance of the boats it sells. Prior to 2006, Plaintiff serviced large yachts at the Great American Marina ("the Marina") located in St. Petersburg, Florida. Allegedly, the Marina is the only viable yacht and large vessel marine service and maintenance yard available to Plaintiff for its Pinellas County customers. The Marina, a ten-acre property that includes nearly five acres of submerged deeded acreage, houses approximately a hundred boat slips and four major structures, including a covered service area totaling 28,000 square feet, and is capable of handling watercraft up to eighty feet in length.

In 2002, Scott Kalitta ("Kalitta") purchased the Marina through his wholly-owned corporation Corlin Enterprises. Kalitta marketed the Marina "for sale by owner" in 2003, at which time Kalitta discussed the property with Kurt Frahn ("Frahn"), Vice President of Marine Max, another Brunswick dealer and competitor of Thunder Marine with operations in Pinellas County. After Kalitta shared his asking price with Frahn, Frahn relayed that "at that point in time that was more than they wanted to spend." (Scott Kalitta Dep. 13:22-14:3, Jan. 11, 2007)

Although he entered into several letters of intent with prospective purchasers, Kalitta was unable to sell the Marina and in February, 2004 hired commercial broker M. William Rex ("Rex") of Preferred Commercial, Inc. to sell the property. During 2004 and 2005, the Marina was under

various contracts for sale with different prospective purchasers. On November 11, 2005, Kalitta and Marine Max executed a sales contract, which ultimately closed on February 8, 2006.

In early 2004, Dustan McCoy ("McCoy"), Brunswick's current chairman and then-president of Brunswick Boat Group, launched the Access to Water Program ("Access to Water") in response to an industry-wide concern that waterfront real estate development was creating a shortage of marinas, which in turn would negatively affect large boat sales. Brunswick's vision for Access to Water was that Brunswick and its dealers would acquire marinas or "otherwise provide [Brunswick] dealers an advantage in the marketplace" through joint ventures. (Dustan McCoy Dep. 48:7-16, Feb. 19, 2007)

In September 2004, Brunswick announced the Access to Water initiative at dealer meetings across the country, inviting its dealers to identify available marinas, bring them to Brunswick's attention, and enter into joint ventures to purchase properties. McCoy hired Thomas Errath ("Errath") as general manager of Access to Water. Errath's responsibilities included all proposals and inquiries Brunswick received regarding available waterfront properties. McCoy's vision was that Errath would be responsible for developing Brunswick's strategy for Access to Water, bringing possible transactions to Brunswick's attention with ideas of how to structure those transactions, and "bring[ing] back real opportunities that have the ability to produce a rate of return at a level . . . satisfactory for Brunswick." (McCoy Dep. at 33:8-34:5)

In November 2004, Errath telephoned LaPrade to introduce himself and to explain Brunswick's goals and objectives relating Access to Water. In March 2005, LaPrade learned that the Marina was available for sale and called Errath to discuss Brunswick's interest in partnering with Thunder Marine to purchase the Marina. LaPrade sent a package of information about the Marina

3

to Errath in late March 2005. The parties dispute what communications occurred in the ensuing months between LaPrade and Errath about the Marina. Undisputed, however, is that Errath never disclosed to LaPrade any criteria that Brunswick may have established for evaluating potential dealer-partners for Access to Water.

During the spring of 2005, LaPrade expressed to Robert Parmentier ("Parmentier"), Executive Vice President of Brunswick's Sea Ray group and President of Baja Corporation, that LaPrade was trying to "get the Brunswick people in motion to come down and look at the marina" but was having a difficult time doing so. (Robert Parmentier Dep. 72:24-73:10, Nov. 16, 2006)

In July 2005, unbeknownst to LaPrade, Marine Max submitted a letter of intent to Kalitta to purchase the Marina. At that time, no formal agreement existed between Marine Max and Brunswick that the potential transaction would come to fruition as a joint venture between the two; however, Errath was aware of Marine Max's letter of intent and kept McCoy apprised that Marine Max planned to submit the letter of intent. By July 29, 2005, Errath learned that Kalitta had rejected Marine Max's letter of intent and that the Marina was under contract with another prospective buyer. That day, Errath communicated by email with Peter Smith ("Smith"), Marine Max's Director of Development, about the rejection and asked Smith, "Can you see what would keep us in?" (Thomas Errath Dep. 119:7-120:15, Jan. 10, 2007) Disputed is whether on that day, Errath called LaPrade to inquire about LaPrade's interest in joining Brunswick and Marine Max in a three-way joint venture to acquire the Marina.

On August 2, 2005, Brunswick's Baja boat division held a dealer meeting in Sanibel, Florida; both Errath and LaPrade attended. Disputed is whether Errath and LaPrade discussed the Marina; undisputed is that Errath did not disclose to LaPrade any information regarding Marine Max's

4

interest in the property.

In late September 2005 Baja held another dealer meeting in St. Petersburg, which Parmentier attended. While in St. Petersburg, Parmentier visited the Marina with LaPrade. Parmentier expressed to LaPrade that the Marina was a good opportunity for Brunswick and the two discussed how the property fit into the strategic initiative of Access to Water. A few days later, Parmentier emailed Errath, requesting that Errath find time to travel to St. Petersburg to visit the Marina with LaPrade. Parmentier expressed to Errath that "[i]t would benefit Baja and Brunswick if [Errath] could meet with [LaPrade] as soon as possible." (Parmentier Dep. 78:16-79:4) Parmentier did not know of, and neither did Errath disclose to Parmentier, Marine Max's interest in the property or that Errath had previously discussed the property with Marine Max. Approximately two weeks after Parmentier emailed Errath requesting that Errath contact LaPrade, Errath responded by email that he had spoken with LaPrade several times about the Marina. Errath wrote: "It is unclear if it is even for sale, but we are pursuing." (Id. at 83:25-84:3)

In October 2005, LaPrade approached his longtime friend and business associate Michael Meagher ("Meagher") about acquiring the Marina together. Meagher was aware that LaPrade and Brunswick had discussed the Marina. (Michael Meagher Dep. 24:14-25:2, Dec. 22, 2006) LaPrade and Meagher visited the Marina and met with Kalitta. At the time of the visit, both LaPrade and Meagher knew that the Marina was not under contract and available for purchase. Kalitta provided LaPrade and Meagher with site plans and descriptive information on the property and showed the property to the pair. Several days later, LaPrade and Meagher met with officials from the City of South Pasadena[3] and later met with officials from the Pinellas County Zoning and Environmental

---

[3] The City of South Pasadena is located within the greater St. Petersburg area.

Department to discuss development of the Marina in light of the City codes.

On November 11, 2005, Marine Max and Kalitta executed a sales agreement that contained a confidentiality provision. At the time of the contract's execution, no formal agreement existed between Marine Max and Brunswick to close the transaction as a joint venture; however, Brunswick knew of the contract, the confidentiality provision, and Brunswick's status as a potential assignee.

LaPrade asserts that he returned to Kalitta in November 2005 to discuss the form of the contract and make an offer of $12 million, at which time Kalitta informed LaPrade that the property was under contract. Allegedly, LaPrade did not learn the identity of the purchaser until after the February 2006 closing.

Between November 2005 and February 2006, Brunswick's mergers and acquisitions group, along with its finance committee, was working internally and with Marine Max to acquire the property as a joint venture. During this time, LaPrade met with Michael Scruggs ("Scruggs") of Riviera Yachts of the Americas ("Riviera") and the two discussed entering into some type of joint arrangement with respect to the purchase of the Marina. LaPrade and Scruggs first discussed the possibility of Thunder Marine purchasing the Marina and Riviera leasing part of the property from Thunder; subsequently, Scruggs expressed Riviera's interest in either partnering with Thunder Marine in the purchase or Riviera buying the property itself. (Michael Scruggs Dep. 17:8-20:6, Feb. 7, 2007)

On February 7, 2006, the eve of closing, Brunswick's Board of Directors formally approved the acquisition after recommendation and initial approval from the finance committee. Marine Max and Brunswick acquired the Marina through a newly formed limited liability company, Gulfport Marina, LLC. Brunswick's initial contribution to the acquisition was $7 million (63.64% ownership

interest) with Marine Max contributing $4 million (36.36% ownership interest). Marine Max and Brunswick finalized the details of the arrangement post-closing.

After learning that Marine Max and Brunswick purchased the Marina in partnership, Plaintiff sued Brunswick for breach of fiduciary duty and violation of the Florida Deceptive and Unfair Trade Practices Act. Plaintiff claims that it reposed trust and confidence in Brunswick, that Brunswick accepted that trust and confidence, and that Brunswick breached its fiduciary duty not to mislead Plaintiff in pursuit of a joint venture, in the pursuit of the acquisition of the Marina, and in the application of the Access to Water program. Plaintiff also claims that Brunswick breached its fiduciary duty by usurping the opportunity Plaintiff presented to Brunswick by joining in the venture with Plaintiff's competitor.

## II.     Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that there is no issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the movant has met this burden, the nonmoving party must identify specific facts that raise a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

"A factual dispute is 'genuine' if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Tipton v. Bergrohr

GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992)). In considering a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." Seroka v. Am. Airlines, Inc., 834 F. Supp. 374, 376 (S.D. Ala. 1993) (citations omitted).

The court must judge all evidence in the light most favorable to the nonmoving party, and all justifiable inferences must be drawn in the nonmoving party's favor. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990) (citations omitted). However, the evidence must also be viewed within the scope of the evidentiary burden of the respective parties under the substantive law of the case. Id. (citing Anderson, 477 U.S. at 248). If, under this standard, the evidence can be considered such that a reasonable fact-finder could find for the nonmoving party, summary judgment is inappropriate. Id. (citing Celotex, 477 U.S. at 324).

**III.    Discussion**

Defendant contends that Plaintiff's claims are supported neither factually nor legally and that summary judgment is proper.

A. Breach of Fiduciary Duty

Defendant argues that Plaintiff's claim for breach of fiduciary duty fails because (1) no fiduciary relationship existed between Plaintiff and Defendant, and (2) even assuming the existence of a fiduciary relationship, Plaintiff cannot establish that Defendant breached any fiduciary obligation to Plaintiff or that the alleged breach proximately caused Thunder damage (Dkt. 32 at 18-20).

Under Florida law, a plaintiff must not only demonstrate the existence of a fiduciary duty, but also the breach of that duty and damages proximately caused by the breach. Gracey v. Eaker, 837 So. 2d 348, 353 (Fla. 2002) (citations omitted). A fiduciary relationship may be either express or

8

implied. Capital Bank v. MVB, Inc., 644 So. 2d 515, 518 (Fla. 3d DCA 1994). Examples of express fiduciary relationships are those created by contract, such as principal/agent or attorney client, or those created by legal proceedings, such as guardian/ward. Id. Alternatively, an implied fiduciary relationship "may be found when confidence is reposed by one party and a trust accepted by the other." First Nat'l Bank and Trust Co. of the Treasurer Coast v. Pack, 789 So. 2d 411, 415 (Fla. 4th DCA 2001) (internal quotation marks and citations omitted). If not formed by express agreement, the specific facts and circumstances surrounding the parties' relationship and the transaction in which they are involved dictate whether a fiduciary relationship has been established. Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp., 850 So. 2d 536, 540 (Fla. 5th DCA 2003) (citations omitted).[4] "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." Watkins v. NCNB Nat'l Bank of Fla., N.A., 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993), rev. denied, 634 So. 2d 629 (Fla. 1994).

An arm's-length transaction between two parties does not give rise to a fiduciary relationship. See Taylor Woodrow, 850 So. 2d at 541 (citations omitted). Absent from an arm's-length transaction is the duty of either party "to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered." Lanz v. Resolution Trust Corp., 764 F. Supp. 176, 179 (S.D. Fla. 1991). Further, a fiduciary relationship is not created where one party places trust or confidence in the other and there is no "recognition, acceptance or undertaking

---

[4] See also Quinn v. Phipps, 113 So. 419, 421 (Fla. 1927) ("The relation and duties involved [in a fiduciary relationship] need not be legal; they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.").

of the duties of a fiduciary on the part of the other party." Id. (citations omitted).

Plaintiff concedes that no express fiduciary relationship existed between Thunder Marine and Brunswick (Dkt. 51 at 7). Defendant argues that the record fails to demonstrate an implied fiduciary relationship between Thunder Marine and Brunswick because (1) the parties are sophisticated corporations and real estate investors; (2) the parties dealt with each other at arm's-length with respect to the Marina; (3) the dealer agreements between Thunder Marine and Brunswick expressly renounce any fiduciary obligations; (4) Thunder Marine's subsequent attempts to partner with Meagher and Riviera Boats to acquire the Marina demonstrate the absence of a fiduciary relationship between Thunder and Brunswick; and (5) Brunswick made no promises to buy the Marina and never agreed to advise, counsel, or protect Thunder Marine (Dkt. 32 at 18-19).

Viewing the evidence in the light most favorable to Plaintiff, no reasonable fact-finder could conclude that an implied fiduciary relationship arose between the parties. Although the dealer agreements' disclaimers of all fiduciary obligations are not determinative, the history of the parties' dealings, at least, precluded the existence of a fiduciary relationship.[5]

While the facts may arguably be in dispute as to whether the parties engaged in an arm's-length transaction concerning the Marina,[6] most important to establishing an implied fiduciary

---

[5] In denying a motion to dismiss, the district court held that the claims in this action are entirely collateral to the dealer agreements between the parties that expressly disclaimed any fiduciary relationship. (Dkt. 16); Thunder Marine, Inc. v. Brunswick Corp., 2007 WL 1877093, **7-8 (M.D. Fla. July 6, 2006).

[6] Thunder Marine had been a long-time Brunswick dealer and Brunswick rewarded Thunder Marine on several occasions with national recognition for excellent performance by a Brunswick product dealer. Errath initiated the contact with LaPrade in November 2004 specifically to discuss Access to Water, which was designed and launched to assist Brunswick's dealers in maintaining water access and boat slips in order to continue to increase sales of Brunswick products.

relationship is whether Plaintiff reposed a confidence in Brunswick and whether Brunswick accepted that trust. See Taylor Woodrow, 850 So. 2d at 540 (citations omitted). Plaintiff's evidence fails to show that LaPrade entrusted any confidence to Brunswick. It is undisputed that Errath never visited the Marina with LaPrade and LaPrade concedes that he never had an agreement with Brunswick. (Mark LaPrade Dep. 183:9-184:4, Nov. 14, 2006) Further, LaPrade could have requested that Brunswick sign a confidentiality agreement with respect to the Marina, but did not.

Even if a material factual dispute existed as to whether Plaintiff reposed a confidence in Brunswick, the record does not support an inference that Brunswick accepted a duty to advise, counsel, or protect Plaintiff. No partnership agreement or exclusivity contract to enter into a joint venture existed between the parties. Further, no Brunswick executive even orally promised LaPrade that Thunder Marine and Brunswick would partner to purchase the Marina. Thunder Marine and Brunswick never attempted to negotiate any term of a contract such as the allocation of the purchase price or closing costs. Although Plaintiff argues that LaPrade and Errath engaged in continuing discussions about the Marina, continuing discussions, without further evidence, do not support a finding that Brunswick accepted a duty to advise, counsel, and protect Plaintiff. See Taylor Woodrow, 850 So. 2d at 539.

Further, Plaintiff admits that it could have purchased the Marina without Brunswick. Plaintiff submits no evidence of its alleged status as a weaker party to the transaction other than the corporations' respective financial sizes. Nor does Plaintiff submit evidence that Brunswick took advantage of Plaintiff when Plaintiff had the opportunity to purchase the property.

Even assuming, however, that Plaintiff can establish an implied fiduciary relationship and the breach of a fiduciary duty, there are no disputed issues of material fact as to whether Defendant's

alleged conduct proximately caused damage to Plaintiff.

"Generally, proximate cause means that the wrong of the defendant caused the damage claimed by the plaintiff." McDonald v. Fla. Dept. of Transp., 655 So. 2d 1164, 1168 (Fla. 4th DCA 1995) (citation omitted). Proximate cause cannot exist without a "natural, direct and continuous sequence between the negligent act and the injury"; in other words, whether it is reasonable that but for the act, the injury would not have occurred. Id. Proximate cause is usually the province of the jury unless the facts are unequivocal and support only one inference. Id.

Plaintiff's alleged damages stem from its inability to purchase the Marina as a result of Defendant's misleading conduct (Dkt. 51 at 14). According to Plaintiff, it wanted to purchase the Marina and was financially able to do so with or without Brunswick. Brunswick's failure to communicate openly, honestly, and candidly with LaPrade allegedly cost Thunder Marine the opportunity to acquire the Marina. Plaintiff claims that its resulting damages are the lost value of the Marina in addition to lost revenue because there is no longer a viable maintenance and service facility for yachts available to Plaintiff.

Plaintiff became aware of the Marina's availability in March 2005. From September 21, 2004 to February 8, 2006, the Marina was "out of contract" and available for purchase a limited number of times. Plaintiff essentially had the opportunity to purchase the Marina during three different time periods during 2005: March15 to April 13; July 20 to August 9; and October 14 to November 11. The Marina was otherwise under contract during 2005.

Although Plaintiff claims that it wanted to purchase the Marina but lost that opportunity because Brunswick lulled Plaintiff into believing a deal had been struck to enter into a joint venture, Defendant correctly points out that Plaintiff had the opportunity to purchase the Marina between

October 14 and November 11, 2005. In October 2005, after visiting the Marina with Parmentier in September and failing to hear from Errath, LaPrade "figured maybe Brunswick wasn't . . . interested in the project anymore or wasn't interested in going forward with their project." (LaPrade Dep. 131:15-18) LaPrade then "opened the door for [Meagher]" to join LaPrade in the acquisition. (Id.) LaPrade and Meagher met with Kalitta in October 2005 and then met with the City of Pasadena and Pinellas County about zoning and permitting. LaPrade and Meagher were fully aware at the time they met with Kalitta, the City of Pasadena, and Pinellas County that the property was available for sale. (Id. at 129:3-7; Meagher Dep. 62:12-19) LaPrade and Meagher did not make an offer to Kalitta at the initial meeting. (Meagher Dep. 62:20-22) In November 2005, LaPrade and Meagher decided to offer Kalitta $12 million for the property and LaPrade returned to Kalitta to discuss the form of a contract. (LaPrade Dep. at 129:8-130:3) At that time, Kalitta told LaPrade the property was under contract. (Id. at 129:8-15)

There is no plausible evidence supporting a link between Defendant's conduct and Plaintiff's failure to purchase the Marina. First, Plaintiff offers no evidence that an opportunity existed (and that Plaintiff passed over such opportunity) to purchase the Marina prior to October, 2005. When the opportunity arose, LaPrade had admittedly decided that Brunswick was not interested in partnering with Thunder Marine. Thus, LaPrade pursued the Marina with Meagher, who allegedly could have written a check for the entire purchase price at LaPrade's and Meagher's first joint meeting with Kalitta. Although LaPrade points out that Meagher's participation was merely "backup" in case Brunswick decided not to participate (LaPrade Aff. ¶ 24; Meagher Dep. 22:16-23:25), Plaintiff fails to offer any evidence that between October 14 and November 11, 2005, LaPrade pursued the venture with Brunswick, that LaPrade relied on representations from Brunswick, or that LaPrade and

13

Brunswick communicated at all about the Marina.

Likewise, no evidence exists that Brunswick was in any way involved with LaPrade's discussions with the City of Pasadena or Pinellas County. If taking as true LaPrade's contention that he and Meagher returned to the Marina in November 2005 to make an offer, LaPrade had clearly accepted, at some point while the property was available for purchase, that Brunswick was no longer a potential partner.

Plaintiff had the opportunity and financial resources to enter into a contract with Kalitta to purchase the Marina between October 14 and November 11, 2005. Because Plaintiff's damages stem from the alleged lost opportunity to purchase the Marina, no causal connection exists between Defendant's conduct and Plaintiff foregoing the opportunity to purchase the Marina. Therefore, Defendant is entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty.

B. Florida Deceptive and Unfair Trade Practices Act

FDUTPA is a broad statute designed to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). A plaintiff seeking damages under FDUTPA must prove (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).

What constitutes an unfair or deceptive act is not defined by statute, but courts have held that an unfair or deceptive practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." PNR, Inc. v. Beacon Property Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks and citations

omitted). The statute "applies to private causes of action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract." Id.

Defendant concedes that FDUTPA properly encompasses the transaction at issue in this case.[7] Defendant maintains, however, that Plaintiff cannot prevail on its FDUPTA claim because evidence is lacking that Brunswick deceived Thunder Marine. Brunswick argues that its participation in acquiring the Marina with Marine Max neither offended public policy nor was immoral, unethical, oppressive, unscrupulous, or injurious to Thunder Marine. Further, Defendant contends that because Plaintiff had ample opportunity to purchase the Marina, Plaintiff cannot prove causation or actual damages. This court agrees that Plaintiff has failed to point to record evidence which raises a genuine issue for trial on the causation element.

Plaintiff's FDUTPA claim fails for the same reasons as its breach of fiduciary duty claim. Taking all of Plaintiff's allegations as true and assuming that Defendant's conduct amounted to a deceptive and unfair trade practice, evidence is lacking that Defendant's conduct proximately caused Thunder to forego the opportunity to purchase the Marina. As stated by one court, "[d]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting

---

[7] FDUPTA is a consumer protection law. The statute defines a consumer as individuals, businesses, and other entities that purchase goods or services from sellers in the conduct of trade or commerce. Shibata v. Lim, 133 F. Supp. 2d 1311, 1317 (M.D. Fla. 2000). Although FDUTPA encompasses real estate transactions, see Zlotnick v. Premier Sales Group, Inc., 431 F. Supp. 2d 1290, 1294 (S.D. Fla. 2006), it is unclear that the transaction at issue here is related to a product or service purchased in connection with a consumer transaction between the parties. Brunswick was neither the seller of the Marina nor the offeror of any good or service to Plaintiff in connection with the Marina. See Fla. Stat. § 501.203(8) (defining "trade or commerce"). Notwithstanding, Defendant does not challenge that the requisite relationship is present here, and the court declines to delve into this issue because Plaintiff fails to raise a genuine issue fact for trial as to the causation element.

reasonably in the circumstances, to the consumer's detriment." Merrill Lynch Business Fin. Svcs., Inc. v. Performance Machine Sys. U.S.A., Inc., No. 04-60861-CIVMARTINEZ, 2005 WL 975773, *8 (S.D. Fla. Mar. 4, 2005) (internal quotation marks and citations omitted). Not only must the conduct be unfair or deceptive, but the consumer must be actually aggrieved by the deception. Id.; In re Crown Auto Dealerships, Inc., 187 B.R. 1009, 1018 (M.D. Fla. 1995).

Here, Plaintiff fails to point to any evidence in the record that raises a genuine issue for trial as to whether Defendant's conduct was detrimental to Plaintiff. Again, Plaintiff could have contracted to purchase the Marina between October 14 and November 11, 2005. Because no evidence exists that Plaintiff relied on any representations by Brunswick during that time frame, there is no reasonable inference of a causal connection between Plaintiff's failure to purchase the Marina and any conduct on the part of Defendant. Absent evidence that Defendant's allegedly deceptive practices precluded Plaintiff from purchasing the Marina, Defendant is entitled to summary judgment on the FDUTPA claim as well.

## IV. Conclusion

When considering the motion, record, and the evidence before the court in the light most favorable to Plaintiff, the court finds that no genuine issues of material fact exist which, if proved by Plaintiff, would entitle Plaintiff to prevail on its claims at trial.

Accordingly and upon consideration, it is **ORDERED AND ADJUDGED**:

(1) Defendants' motion for summary judgment (Dkt. ) is **GRANTED**.

(2) The Clerk of Court is directed to enter judgment in favor of Defendant, close this case, and terminate all pending motions.

**DONE AND ORDERED** in Tampa, Florida this 8th day of August, 2007.

_____
ELIZABETH A JENKINS
United States Magistrate Judge